## In re OLMAN et al.

### (District Court, S. D. Ohio, W. D. November 1, 1902.)

### No. 3,226.

1. BANKRUPTCY—COMPOSITION—FAILURE TO KEEP BOOKS—DISPOSITION OF ASSETS.

Where, on an application for confirmation of a composition by a bankrupt tailoring firm, it appeared that they kept no cash book, journal, or ledger, and the only books produced by them before the referee were two bankbooks, it being claimed that all the other books relating to the business which they had kept were lost, and the only disclosure with reference to an alleged loss of some $30,000 of capital was that it was lost because of a tailors' strike, which lasted five or six weeks, and was followed by botch work when they returned to duty, compelling the bankrupts to sell their goods at 50 per cent. of the cost, it appearing that they employed only 15 tailors, and that such explanation could not be true, the confirmation would be denied on the ground that they failed to keep books for the purpose of concealing their true financial condition, etc.

In Bankruptcy.

Frank Seinsheimer, for bankrupts.
F. F. Oldham and Charles B. Wilby, for American Woolen Co.

THOMPSON, District Judge. The bankrupts offered terms of composition to the creditors, which were accepted by a majority of them, representing a majority in amount of the claims allowed, and the bankrupts then filed their application for the confirmation of the composition, and thereupon the American Woolen Company, one of the creditors, filed specifications in opposition thereto. The application and specifications were referred to the referee to ascertain and report the facts. The referee reported the facts and his conclusions of law thereon, and recommended the approval of the confirmation. Exceptions to the report were filed by the American Woolen Company, and the matter is now submitted upon the report and the exceptions.

The confirmation of the composition is opposed on the following grounds: (1) That with fraudulent intent to conceal their true financial condition, and in contemplation of bankruptcy, the bankrupts, for a year prior to the filing of their petition in bankruptcy, failed to keep books of account, or any record from which their true condition might be ascertained; (2) that the bankrupts knowingly and fraudulently concealed property from the trustee; and (3) that the bankrupts made false oaths in relation to the proceedings in bankruptcy.

In July, 1900, the bankrupts removed from Cincinnati to New York,

where they engaged in the manufacture and sale of clothing. Their cash capital was about $5,000. On the 1st day of July, 1901, their financial condition, as shown by statement made as of that date, was as follows:

| | | |
|---|---|---|
| Merchandise on hand | $14,670 00 | |
| Book accounts | 6,328 00 | |
| Cash on hand | 350 00 | |
| Indebtedness | | $ 9,055 00 |
| Assets | | 12,293 00 |
| | $21,348 00 | $21,348 00 |

In March, 1902, the bankrupts removed from New York to Cincinnati, bringing with them their stock of goods for the purpose of resuming business here, and secured a room or building on Pearl street for that purpose. But upon unpacking their goods they realized, as they claim, for the first time, that they were insolvent; and after the rejection of a compromise, which they proposed to their creditors, they, on May 31st of this year, filed their petition in bankruptcy, their schedules showing their indebtedness to be $20,120.08, their assets $2,502.10, leaving a balance of indebtedness of $17,617.98. The only books kept by the bankrupts were bankbooks, checkbooks, order books, a memorandum book containing the outstanding accounts and the accounts against them, a book of samples, a memorandum book of the goods sent out to tailors, and a book for the manufacturing room. They did not keep a cashbook, journal, or ledger. The only books produced by them before the referee were two bankbooks—one showing an account with the Columbia Bank of New York, covering the time from December 3, 1901, to March 21, 1902; the other showing an account with the Market National Bank of Cincinnati, covering the time from March 26 to April 4, 1902. It is claimed that all the other books were lost. In a few months they stepped from prosperity into bankruptcy. If the figures given by them in the statement of July and their schedules in bankruptcy be correct, they lost during the eight months from July to March nearly $30,000. The bankrupts do not show, nor undertake to show, what their receipts and expenditures were during this period. The bankbooks, however, show deposits from December 3, 1901, to March 27, 1902, both inclusive, to the amount of $20,289.02. All of this amount was checked out during the same period, except $23.64. The bankbooks do not show the names of the persons to whom the checks were made payable, and but 13 of the checks have been produced. Twelve of these checks were made payable to various persons, presumably in payment of accounts which they had against the bankrupts. The other check was made payable to the Columbia Bank, and represented moneys which Adolph Olman received from the bank, and which he claims to have used in paying the claims of tailors. In short, these books and the 13 checks show that $1,221.08 of these moneys were used in paying debts of the firm; that on March 27, 1902, there was a balance on hand of $23.64; but there is nothing to show what became of the remainder, amounting to $19,044.30, except the general statement of the bankrupts that it was used to pay the claims of tailors and other debts of the firm, but they do not give the name of a single cred-

itor to whom any part of this large sum was paid, except Olshewitz and Linch, cousins of Nat Olman, to whom it is claimed they paid $2,275 for borrowed money. Upon all the evidence the account stands as follows:

| | |
|---|---:|
| July 1, 1901, assets | $12,293 00 |
| Deposits from Dec. 3, 1901, to March 27, 1902, inclusive | 20,289 02 |
| Money borrowed of the cousins | 2,275 00 |
| Total | $34,857 02 |
| Assets shown by schedule in bankruptcy | $ 2,502 10 |
| Debts paid out of the deposits | 1,221 08 |
| Borrowed money returned to the cousins | 2,275 00 |
| Balance unaccounted for | 28,858 84 |
| Total | $34,857 02 |

This statement does not include the receipts and expenditures of the firm from July to December, because there is no evidence tending to show what they were, and the statement assumes that the assets on hand are of the value of $2,502.10, although Adolph Olman says he thinks that they are worth $1,000. In view of the capital invested and the extent and character of the business, this unaccounted for balance is so large as to require explanation from the bankrupts. The explanation offered is that they lost $30,000 because of a strike by the tailors, which lasted five or six weeks, and was followed by botch work when they returned to duty, which compelled the bankrupts to sell their goods at 50 per cent. of the cost value. Now, in order to lose $30,000 upon this basis, it would be necessary to sell goods of the cost value of $60,000, thereby compelling the bankrupts to increase their indebtedness either for borrowed money or goods to the amount of about $48,000 over and above the assets shown by the July statement. A sale of goods of the cost value of $60,000 at 50 per cent. of that value would involve a loss of $30,000 and produce $30,000, and the $30,000 received would reduce the indebtedness to about $18,000 or $20,000. But the statement cannot be accepted as true. It is unreasonable and incredible. It cannot be supposed that the strike of the tailors for five or six weeks could produce such results. They employed but 15 tailors, and certainly their botch work after their return to duty cannot be regarded as an inducement to such an extraordinary expansion of the business, especially when it involved the sale of the goods at 50 per cent. of the cost value. The absurdity of the explanation offered compels the belief that the bankrupts failed to keep books from which their true condition might be ascertained, and withheld such books as they did keep for the purpose of concealing their true financial condition, and to enable them to conceal property from their creditors, and that it was done with a view to force a profitable compromise with the creditors, or ultimately to secure a discharge from their debts through proceedings in bankruptcy.

The application to confirm the composition therefore will be refused.